**FILED**

JOSEPHINE CORSO,

FEB **1 6** 2006

Plaintiff,

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

v.

**Case No. 03 C 9424**

SUBURBAN BANK & TRUST COMPANY,
BLANCHE HILL, and DAVID HILL,
III,

**Hon. Harry D. Leinenweber**

Defendants.

## MEMORANDUM OPINION AND ORDER

Plaintiff Josephine Corso (hereinafter, "Plaintiff") filed the instant action against Defendants Suburban Bank & Trust Company (hereinafter, "Suburban"), Blanche Hill (hereinafter, "Mrs. Hill") and David Hill, III (hereinafter, "Hill III"), alleging that Defendants terminated Plaintiff from her position as Suburban's President and CEO on the basis of her age and gender, in violation federal employment laws.

Plaintiff's complaint also includes a claim under the Illinois Wage Payment & Collection Act (the "IWPCA"), as well as various common-law claims, arising from Defendants' purported failure to pay Plaintiff an earned bonus.

Defendants have moved for Partial Summary Judgment on all Counts with the exception of Count VI (Breach of Contract) and Count VIII (IWPCA claim, upon which Defendants seek summary judgment only for Blanche Hill and David Hill, III. For the

reasons stated herein, Defendants' motion is **granted in part** and **denied in part**.

## I. **FACTUAL BACKGROUND**

Plaintiff began her employment at Suburban, a commercial bank located in Elmhurst, Illinois, in 1983 in a clerical position within the loan department. During her tenure, Plaintiff was promoted several times and held various positions, including, Vice President of Loan Operations, Executive Vice President, and Chief Operating Officer. In late 1998, Plaintiff was appointed by the Board of Directors to the position of Bank President. At the time, she was 52 years old.

Throughout most of her employment with Suburban, Plaintiff reported to David Hill, Jr. (hereinafter, "Hill Jr."), who, for many years prior to Plaintiff's promotion, had served as Bank President and was also CEO and Chairman of the Board. Following Plaintiff's promotion, Hill Jr. remained actively involved in the Bank's activities and continued to act as Chairman and CEO. Although unknown to the Board at the time, Hill Jr. and Plaintiff had been engaged in a secret affair for several years.

In July of 2002, Hill Jr. was diagnosed with lung cancer, which led to his death on October 18, 2002. Several months prior to his death, however, Hill Jr. designed a succession plan for Suburban, under which his wife, Blanche Hill, then 73 years old, would become Chairwoman of the Board and Plaintiff would be promoted to CEO and continue her existing duties as Bank President.

With the approval of the Board, the succession plan was implemented upon Hill Jr.'s death in October of 2002.

Although Suburban's financial results showed some improvement in the months following Hill Jr.'s death, its overall performance during the years following Plaintiff's promotion to Bank President was, in the opinion of the Board members, mediocre and steadily declining. Net income per share, return on average assets, and return on average equity were in decline, while the rate of non-performing loans continued to increase. During this period, a greater than normal percentage of the Bank's profits were attributable to non-recurring income such as proceeds from the sale of real estate and securities. In addition, employee turnover was very high, particularly in the loan department. In early 2003, non-performing loans reached record high levels and the trust department lost its largest customer. At that time, several Board members questioned Plaintiff's competency as Bank Presidency, believing that she lacked the management and leadership skills necessary to reverse the Bank's declining financial performance.

During the first Board meeting following Hill Jr.'s death in October of 2002, Board member Constantin Kari stated privately to Mrs. Hill that he did not believe Plaintiff could run the bank effectively and suggested that she be terminated. Mrs. Hill, however, who had just assumed the position of Chairwoman, sought to effectuate the succession plan and desired to work with Plaintiff to improve the Bank's performance. The subject of Plaintiff's

termination came up again in December of 2002, when Board member John Carroll met with Mrs. Hill and expressed his concerns about the Bank's financial performance and disagreement with Plaintiff's overall strategic plan for the Bank. Carroll suggested that Mrs. Hill could effectively lead the bank, despite her relative inexperience in banking, because she was knowledgeable in business generally and could draw upon the specific skills and experience of others at the bank who would be willing to assist her.

Notwithstanding Mrs. Hill's intention to work with Plaintiff on improving the Bank's performance, their relationship deteriorated rapidly beginning in early 2003. It was Mrs. Hill's belief that Plaintiff did not respect her position as Chairwoman. Among other things, Mrs. Hill believed that her phone calls and mail were being intercepted by Plaintiff, including one instance where an important letter offer by a major title company to purchase the Bank's trust department was not delivered to Mrs. Hill. The two also had other disputes regarding various matters such as Mrs. Hill's possession of certain items belonging to the Bank that had been used by her late husband, and Plaintiff's failure to comply with Mrs. Hill's request to implement her suggestions regarding office policy.

These problems persisted until March 24, 2003, when Board members John Carroll, Joel Herter, Frank Murnane, Mrs. Hill, and David Hill III met to discuss the Bank's financial woes and whether Plaintiff would be capable of turning things around. They decided

- 4 -

among themselves to call for Plaintiff's termination as Bank President and CEO at the subsequent Board meeting, believing, based on prior discussions, that the other Board members would be in agreement.

On March 25, 2003, Carroll and Hill III met with Plaintiff prior to the board meeting and requested that she resign, informing her that the Board would be calling for her termination. Plaintiff declined to resign. At the board meeting later that day, the nine present members of the Board voted unanimously to terminate Plaintiff from her position as Bank President and CEO. Plaintiff was not provided with a specific reason for her discharge, other than the Bank "could have done better" and had decided to "go in a different direction." Additional reasons for Plaintiff's termination were later provided in Defendants' EEOC position statement, which cited unacceptable financial performance during her tenure as President, poor management skills, lack of trust, poor executive temperament, and other integrity issues.

Prior to Plaintiff's termination, Suburban's Compensation Committee, which has sole responsibility for determining executive compensation, voted in June of 2002 to approve the payment of bonuses to then-Chairman Hill Jr., Plaintiff, and CFO David DeGroot. The bonuses were contingent upon the Bank achieving a net income goal of $5 million for 2002. The Committee, which consisted of Frank Murnane, Maurice Ettleson, and Joel Herter, approved bonus amounts of $100,000 for Hill Jr., $40,000 for Plaintiff, and

$20,000 for DeGroot. In its annual report for 2002, Suburban reported a net income of $5,097,325; however, Plaintiff never received any bonus for that year.

On May 29, 2003, Plaintiff filed a Charge of Discrimination with the EEOC, alleging that Suburban unlawfully terminated her on the basis of her age and sex. Subsequent to the EEOC filing, Plaintiff attempted to access her personal checking accounts at the Bank over the internet, yet was unable to do so. As a result, Plaintiff could not transfer funds to cover two checks drawn upon her account, which caused those checks to be returned by the Bank for insufficient funds. Plaintiff subsequently commenced this litigation in December of 2003.

## II. **LEGAL STANDARD**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it could affect the outcome of the suit under the governing law, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view all the evidence and any reasonable inferences therefrom in the light most favorable to the non-moving party. *See*

*Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000).

## III. **DISCUSSION**

Plaintiff's Complaint consists of nine separate counts. Counts I through III allege sex and age discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 623, *et seq.* Plaintiff's theory of the case is based on disparate treatment, namely, that younger male employees were not subjected to the same termination and disciplinary standards as Plaintiff, and that Defendants' proffered reasons for her termination were pretextual. Counts IV and V allege retaliation claims under Title VII based on the Bank's purported actions in shutting down her online bank accounts and causing her checks to bounce after she had filed her EEOC charge against Defendants. Count VII is based on promissory estoppel, where Plaintiff alleges that she relied to her detriment on Defendants' unfulfilled promise that she would be paid a bonus for reaching the Bank's net income target for 2002. In Count VIII, Plaintiff alleges a claim under the Illinois Wage Payment & Collection Act (the "IWPCA"), also based on Suburban's failure to pay her bonus. Count IX alleges a claim for tortious interference with business relations against individual defendants Mrs. Hill and Hill III, based on the contention that they caused the Board to terminate Plaintiff and withhold her bonus for personal reasons

having to do with Plaintiff's affair with Hill Jr. Each of these claims shall be addressed in turn.

## A. Title VII and ADEA Claims

A plaintiff alleging employment discrimination under Title VII or the ADEA may prove her claims of intentional discrimination under the direct or indirect method. *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616-17 (7th Cir. 2000). Here, Plaintiff has chosen to proceed under the indirect method, which requires Plaintiff to establish a *prima facie* case of discrimination according to the familiar *McDonnell Douglas* framework. To do this, Plaintiff must show that (1) she was a member of a protected class; (2) she was performing her job satisfactorily; (3) the employer took an adverse employment action against her; and (4) the employer treated at least one similarly situated individual outside of her protected class more favorably. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).

If Plaintiff establishes a *prima facie* case, the employer must articulate a legitimate, non-discriminatory reason for its employment action, and in response the plaintiff must prove that the employer's proffered non-discriminatory reason is a pretext for discrimination. *Id.* (citing *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002)); *see also Radue*, 219 F.3d at 617. The *McDonnell Douglas* burden shifting approach applies to Plaintiff's sex

- 8 -

discrimination claims as well as her age discrimination claims. *See Peele*, 288 F.3d at 326.

There is no dispute that Plaintiff was a member of a protected class according to her age and gender, and that her termination constituted an adverse employment action. Accordingly, the crux of the dispute centers on prongs 2 and 4 of the *McDonnell Douglas* test. However, as discussed below, because Plaintiff does not identify an appropriate similarly-situated employee, her Title VII and ADEA claims fail on that basis alone. *See, e.g., Jackson v. Worldwide Flight Svcs.*, No. 03 C 1940, 2004 WL 2203430, \*7 (N.D. Ill. Sept. 29, 2004)(noting that if the plaintiff has failed to identify a similarly situated co-worker, the court need not determine whether the plaintiff was performing satisfactorily or whether the reasons of discharge were pretextual).

Plaintiff bases her *prima facie* case primarily on her comparison to three employees: David Hill, Jr., the former President and CEO; Les Cheatle, the head of Suburban's Trust Department; and Wayne Postma, the head of Suburban's Loan Department. (Pl. Resp. at 11.) Plaintiff uses each of these individuals for the purpose of establishing her sex discrimination claim, while Postma, who is substantially younger than Plaintiff, is also used to prove her age discrimination claim. (*Id.*)

In order to show that two employees are similarly situated, Plaintiff must identify someone who is directly comparable to her in all material respects. *Patterson v. Avery Dennison Corp.*, 281

F.3d 676, 680 (7th Cir. 2002). For purposes of comparison, a court must examine all relevant factors, the number of which depends on the context of the case. *Radue*, 219 F.3d at 617. Those factors include whether the employees dealt with the same supervisor, were subject to the same standards, and whether they had comparable experience, education and qualifications. *Patterson*, 281 F.3d at 680.

### 1. Comparison to Cheatle and Postma

Plaintiff contends that Cheatle and Postma were similarly situated to her, and were in fact responsible for the Bank's declining results, yet they were not subjected to termination as a result of their poor job performance. (Pl. Resp. at 12 (citing LR 56.1(b) Statement of Add. Material Facts ("LR 56.1") ¶¶ 68-69).) In support of her argument, Plaintiff suggests that it was Cheatle's fault that the bank lost its third-largest trust customer in 2002. Similarly, with respect to Postma, Plaintiff contends that, as head of the loan department, he authorized a substantial number of the non-performing loans contributing to the Bank's poor financial results.

Contrary to Plaintiff's contentions, Cheatle and Postma, who both held positions junior to Plaintiff, do not serve as proper comparisons for purposes of establishing Plaintiff's *prima facie* case. As President, Plaintiff was responsible for the Bank's overall performance. Her responsibilities included high level tasks such as setting and achieving strategic and operational

- 10 -

goals, supervising and evaluating bank officers, and delegating responsibility for daily operational and administrative duties. (*See* Pl. Appx., Exh. D.) Cheatle and Postma, however, were responsible solely for their own departments and had far fewer operational and management responsibilities, which makes them improper comparitors for Plaintiff's *prima facie* case. *See Patterson*, 281 F.3d at 680 (noting that different levels of experience and job responsibilities preclude comparison as similarly situated employees).

Even if the Bank's failing performance during Plaintiff's tenure as President could be attributed in part to Cheatle and Postma, it is perfectly reasonable that the Board would hold the Bank's President to a different performance standard than its more junior executives. *See, e.g., Hossack v. Floor Covering Assoc. of Joliet*, No. 03 C 3067, 2004 WL 2423825, *3 (N.D. Ill. Oct. 22, 2004)(finding that Plaintiff, an office manager, was not similarly situated to a top salesman who shared general manager duties). Indeed, the members of the Board cited not only to the Bank's declining performance, but also to Plaintiff's management style, leadership skills, and high rate of employee turnover as reasons for her termination. (*See* Def. LR 56.1 ¶ 49.) Moreover, the fact that Plaintiff authorized a bonus for Cheatle in 2002, after the trust department's biggest customer had left, significantly undercuts her contention that he was equally blameworthy of the

Bank's declining financial results. (See Pl. Appx., Corso Dep., at 209.)

## 2. Comparison to Hill Jr.

Plaintiff's reliance on Hill Jr. to establish a similarly situated employee is equally unavailing. Although Plaintiff and Hill Jr. both served as President and CEO, they did so at different times and under very different circumstances. This distinction proves fatal to Plaintiff's attempt to link the two for purposes of establishing her *prima facie* case. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir. 2001) (noting that employees are similarly situated when they hold the same or equivalent positions *at the time of the employment decision in question*)(emphasis added). Here, there is no overlapping time period during which Plaintiff and Hill Jr. could be considered similarly situated. Significantly, the Bank's declining performance began in 1999, after Plaintiff was appointed as President. (Def. LR 56.1 ¶ 14.) Prior to that time period, Hill Jr. had been CEO and President of the Bank for more than twenty years. Plaintiff, however, became CEO (in addition to her existing role as President) after Hill Jr.'s death in October of 2002, at a time when the Bank's troubles regarding problematic loans, high employee turnover, and client departures had only recently come to the Board's attention. Plaintiff has thus failed to demonstrate that she and Hill Jr. had engaged in similar conduct "without such

differentiating or mitigating circumstances" that would justify disparate treatment by the Board. *Peele*, 288 F.3d at 330.

In sum, having failed to identify a similarly situated employee for her age or sex discrimination claims, Plaintiff has not met her burden of establishing a *prima facie* case under the *McDonnell Douglas* framework. Accordingly, Defendants are entitled to summary judgment on Plaintiff's Title VII and ADEA claims. *Id.* at 327 ("If a plaintiff is unable to establish a prima facie case of employment discrimination under *McDonnell Douglas*, an employer may not be subjected to a pretext inquiry.")

## B. Retaliation Claims

Plaintiff also alleges a retaliation claim based on Defendants' post-termination conduct in shutting down Plaintiff's online bank account and causing several of her checks to bounce. Under Title VII, unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Again, Plaintiff is entitled to prove her retaliation claim using the *McDonnell Douglas* framework. *Id.; see also Gilbert v. Am. Airlines, Inc.*, No. 01 C 3088, 2004 WL 783362, *5 (N.D. Ill. Jan. 7, 2004).

Despite the parties' apparent disagreement, post-termination acts of retaliation are actionable under Title VII. *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997). However, there must be some

- 13 -

nexus to an adverse employment decision. See *Gilbert*, 2004 WL 783362, at \*5 (citing *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 (7th Cir. 1996)). In other words, the retaliation must impinge upon Plaintiff's efforts to secure future employment or otherwise adversely affect her prospects for employment. *Id.* Here, Plaintiff alleges that after she filed her EEOC charge, the Bank cut off internet access to her accounts and caused two of her checks to be returned for insufficient funds, costing her additional fees and expense. Simply put, these are not the kinds of post-termination acts that qualify as interfering with Plaintiff employment prospects. See, e.g., *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996)(finding that a criminal complaint filed by an employer against a former employee can constitute the requisite adverse action). Moreover, even if Plaintiff could establish the requisite nexus to employment, a mere inconvenience such as additional fees incurred on two bounced checks does not rise to the level of actionable adverse action. See *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 (7th Cir. 2001).

Finally, assuming *arguendo* that Plaintiff could establish a *prima facie* case, Defendants have offered a legitimate, non-discriminatory reason for Plaintiff's online banking troubles. Plaintiff's account was disabled because the maximum number of unsuccessful login attempts within a 24-hour period had been exceeded. (Pl. Resp. to Def. LR 56.1 ¶ 71.) In light of this undisputed justification, there is no genuine issue of fact

- 14 -

supporting Plaintiff's retaliation claim. Defendants are therefore entitled to summary judgment on Counts IV and V.

## C. Punitive Damages

Title VII permits recovery of punitive damages if the plaintiff demonstrates that defendant engaged in a discriminatory practice with "malice or reckless indifference to the federally protected rights of an aggrieved individual." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1126 (7th Cir. 1996)(citing 42 U.S.C. § 1981a(b)(1)). Because Plaintiff has not shown a violation of her rights under federal employment laws, she is not entitled to punitive damages.

## D. Promissory Estoppel

As part of her promissory estoppel claim, Plaintiff seeks to recover damages for incurring certain personal expenses in the expectation that she would receive a bonus based on the Bank's financial performance in 2002. In order to recover damages based on promissory estoppel, a plaintiff must prove that (1) defendant made an unambiguous promise to plaintiff; (2) plaintiff relied on this promise; (3) plaintiff's reliance was expected and foreseeable by defendant; and (4) plaintiff relied to his detriment. *Pokora v. Warehouse Direct, Inc.*, 751 N.E.2d 1204, 1212 (Ill. App. Ct. 2001).

The central issue here is whether, and to what extent, Plaintiff relied to her detriment on Suburban's promise to pay her the $40,000 bonus. Initially, Plaintiff had argued that she relied on the promise of a bonus by continuing to work at the Bank, with

- 15 -

the implication that, without the bonus, she would have resigned from her position. (*See* Am. Cmpl. ¶ 75.) This theory of reliance, however, was contradicted by Plaintiff's own deposition testimony, where she stated that Suburban's promise to pay her a bonus had no impact on her decision to remain with the Bank, and that she would have continued to work there in any event. (Def. LR 56.1, Exh. M, at 220-21.)

In her response brief, however, Plaintiff also asserts that she relied on the promise of a bonus when she decided to take an expensive vacation with her family, which she would not have taken absent her expectation of a bonus. (Pl. Resp. at 20.) Although this new theory was not alleged in Plaintiff's amended complaint, Plaintiff would be permitted to amend the pleadings to conform to the evidence obtained in discovery. *See* FED. R. CIV. P. 15(b). Viewed in a light most favorable to Plaintiff, her allegations regarding personal expenses incurred in reliance on the Bank's promise of a bonus are sufficient to withstand summary judgment. *See, e.g., Quake Constr., Inc. v. Am. Airlines*, 565 N.E.2d 990, 1005 (Ill. Sup. Ct. 1990)(noting that a plaintiff's consequential expenditure of funds in reliance on a promise by the defendant may permit a claim for promissory estoppel). Similarly, whether Plaintiff reasonably and foreseeably relied upon the Bank's promise, and whether the bonus was actually earned, are disputed issues of material fact and thus entitled to resolution by a jury.

## E. Individual liability under IWPCA

Plaintiff brings her IWPCA claim against Suburban and against Defendants Hill III and Mrs. Hill, individually (the "Individual Defendants"). However, Defendants seek summary judgment on Plaintiff's IWPCA claim only with respect to Individual Defendants. On that score, Plaintiff's theory of liability is that Individual Defendants, both directors of the Bank, knowingly permitted Suburban to violate the IWPCA by refusing to pay Plaintiff's earned bonus. See 820 ILCS 115/13. However, Plaintiff supports her allegations with no more than mere speculation, based on her personal belief, that Individual Defendants were involved in the decision to defer and ultimately deny Plaintiff's bonus for 2002.

To the contrary, the undisputed facts demonstrate that the Compensation Committee, which is comprised solely of Board members Frank Murnane, Maurice Ettleson, and Joel Herter, decides on its own whether bonuses are to be paid, and that the Committee followed protocol in this instance. (Def. Mot., Exh. G, I, J.) In addition, both Hill III and Mrs. Hill, who are not members of the Committee, testified that they did not communicate with the Committee members and were not present during the Committee meetings where the subject of Plaintiff's bonus was discussed. Given that Individual Defendants were not in a position to affect the Committee's decision to withhold bonuses, and did not consult with the Committee about Plaintiff's bonus, Plaintiff has not established a basis for individual liability under the IWPCA

against Hill III and Mrs. Hill. *See Andrews v. Kowa Printing Corp.*, 838 N.E.2d 894, 899-900 (Ill. Sup. Ct. 2005) ("Personal [IWPCA] liability is reserved for those *decision makers* who knowingly permitted the [IWPCA] violation.")(emphasis added). Therefore, if Plaintiff's claim under the IWPCA is to proceed, it must be against Suburban alone.

## F. Tortious Interference

Plaintiff also brings a claim against Individual Defendants based on tortious interference with business relations. Specifically, Plaintiff's theory is based on the contention that Individual Defendants persuaded the Board to terminate Plaintiff and withhold her bonus solely for personal reasons having to do with Plaintiff's affair with Hill Jr.

Although in their briefing the parties include a general discussion of tortious interference, they fail to mention that the specific tort differs depending on the purported right with which Defendants have allegedly interfered. In this regard, the two rights at issue are Plaintiff's right to her $40,000 bonus, and separately, her right to continued employment at Suburban.

With respect to the bonus, Defendant's conduct should be analyzed as tortious interference with contractual relations, given that Plaintiff's right is based on the purported existence of an oral contract (which Plaintiff has alleged but Defendants have not challenged in the present motion). To demonstrate tortious interference with a contract under Illinois law, a plaintiff must

- 18 -

prove (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) defendant's awareness of the contractual relationship; (3) defendant's intentional and unjustifiable inducement of a breach of the contract; (4) a subsequent breach of the contract caused by Defendant's wrongful conduct; and (5) damages. *Cress v. Recreational Svcs. Inc.*, 795 N.E.2d 817, 842 (Ill. App. Ct. 2003).

Here, as with her IWPCA claim, Plaintiff fails to show that Individual Defendants had anything to do with, let alone induced, Suburban's failure to pay Plaintiff her bonus. As noted above, Plaintiff's bonus was exclusively within the authority and discretion of Suburban's Compensation Committee, of which Individual Defendants were not even members. Moreover, as shown in their supporting affidavits (which Plaintiff counters only with her own speculation), the Committee members did not consult with and were not influenced by Individual Defendants in making their decision not to pay bonuses for Suburban's performance in 2000. Consequently, with specific regard to her bonus, Plaintiff's tortious interference claim must fail because she has not shown that Individual Defendants intentionally induced a breach of her purported bonus contract, or that Individual Defendants' acts caused such breach.

The other part of Plaintiff's tortious interference claim relating to her continued employment differs slightly in that it is more properly analyzed under the case law pertaining to intentional

- 19 -

interference with prospective economic advantage. Illinois courts recognize that this tort is available to an at-will employee alleging interference with her employment relationship. *See Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. Sup. Ct. 1991); *see also Hoskins v. Droke*, No. 94 C 5004, 1995 WL 318817, *4 (N.D. Ill. May 24, 1995). To recover damages for intentional interference with prospective economic advantage, a plaintiff must demonstrate: (1) her reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to plaintiff resulting from such interference. *Fellhauer*, 568 N.E.2d at 878.

Plaintiff's theory is that Individual Defendants were angry with Plaintiff over her affair with Hill Jr., and based on their "intense dislike" for Plaintiff, they persuaded seven of the other nine voting Board members to terminate her. (Pl. Resp. at 24.) In an effort to establish that their personal animosity existed prior to her termination, Plaintiff asserts that Individual Defendants found out about the affair from an anonymous letter alleging that Hill Jr. had a mistress who was the Bank's President. (*Id.*) Yet, crucially, Plaintiff lacks any evidence linking Individual Defendants' prior knowledge of the affair to the allegation that they took affirmative steps to persuade the members of the Board to

vote in favor of her termination. To the contrary, the seven other voting Board members each testified that Plaintiff was fired due to the Bank's ailing performance and Plaintiff's ineffective management, not for any reason pertaining to her affair with Hill Jr. Mere knowledge of the affair alone does not establish purposeful interference and does not create a genuine issue of fact for trial.

In sum, Plaintiff's theory that Individual Defendants conspired against Plaintiff to turn the entire Board against her lacks any support in the record. Like the tortious interference claim pertaining to her bonus, it is based solely on her own conjecture and speculation, which is insufficient to survive summary judgment.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion for Partial Summary Judgment is **granted in part** and **denied in part**.

Defendants' Motion is **granted** with respect to Counts I – V, Count VIII (dismissing the individual defendants only), and Count IX. Defendants' Motion is **denied** with respect to Count VII (Promissory Estoppel).

As for Plaintiff's remaining state law claims, a district court may decline to exercise supplemental jurisdiction over pendant state law claims if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); *see also Contreras v. Suncast Corp.*, 237 F.3d 756, 766 (7th Cir. 2001)

("A district court's decision to relinquish supplemental jurisdiction is the norm, not the exception.")(internal quotations omitted). Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, which include Counts VI (Breach of Contract), VII (Promissory Estoppel), and VIII (IWPCA claim against Suburban only). Those Counts are therefore **dismissed** without prejudice.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: February 16, 2006